Cecil I. Haas v. Commissioner. Marian St. Laurent v. Commissioner. Georges C. St. Laurent v. Commissioner.
Haas v. Commissioner
Docket Nos. 36653-36655.
United States Tax Court
1953 Tax Ct. Memo LEXIS 102; 12 T.C.M. (CCH) 1117; T.C.M. (RIA) 53322; September 30, 1953
Louis D. Blum, C.P.A., 110 East 42nd Street, New York, N. Y., and Mason G. Kassel, Esq., for the petitioners. J. F. Lawless, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income taxes against petitioners as follows: Docket
Defi-
No.
Petitioner
Year
ciency
36653
Cecil I. Haas
1946
$ 4.70
36654
Marian St. Laurent [1]
1944
15,446.59
1945
42,643.53
36655
Georges C. St.
Laurent [1]
1944
12,541.22
1945
42,466.89
The proceedings were consolidated for trial and some of the issues were conceded by the parties. The remaining questions are: 1. Whether *103 salaries of $3,000 and $10,000 received by petitioners Georges C. St. Laurent and Marian St. Laurent, respectively, hereinafter called "the St. Laurents," from Hotel Research Laboratories, Inc., are to be included in their respective incomes for the year 1943 or for the year 1944. 2. Whether the partnership of the St. Laurents, hereinafter called "the St. Laurent partnership," was terminated on May 31, 1945 and whether a new partnership consisting of the St. Laurents and Cecil I. Haas, hereinafter called "the Haas & St. Laurent partnership," was validly created on June 1, 1945. 3. In the event the Haas & St. Laurent partnership is not recognized for tax purposes, (a) whether respondent correctly reconstructed the income of the St. Laurent partnership for the fiscal year ending November 30, 1945 and (b) whether respondent erred in failing to carry back the St. Laurents' distributive share in the partnership's net operating loss for the year ending November 30, 1946 in determining their 1944 tax liability. 4. Whether amounts of $5,000 and $1,000 claimed as deductions for traveling and entertainment expenses in the 1944 tax returns of petitioners Georges C. St. Laurent and Marian *104 St. Laurent, respectively, are properly deductible. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found. Petitioners Georges C. St. Laurent and Marian St. Laurent are husband and wife, residing in Tenafly, New Jersey. Their Federal income tax returns for the taxable years involved were filed with the collector of internal revenue for the third district of New York. Petitioner Cecil I. Haas, hereinafter called "Haas," resides in Scarsdale, New York, and filed his Federal income tax return for the calendar year 1946 with the collector of internal revenue for the fourteenth district of New York. Issue 1 Hotel Research Laboratories, Inc., hereinafter sometimes referred to as "the corporation," was incorporated under the laws of the State of New York on September 7, 1939, to engage in the business of manufacturing and selling solidified alcohol. It continued its business until December 31, 1943. During those years, all of the corporation's stock was registered in the name of Georges St. Laurent, and he and Marian St. Laurent were directors, and also president and secretary, respectively. The formula for the solidified alcohol product *105 manufactured and sold by the corporation was conceived during the years 1938 and 1939 by Georges St. Laurent. During that time and many years prior thereto, he was a consultant to hotels and to the American Hotel Association on engineering and rehabilitation problems. During the corporation's existence, its business was managed principally by Marian St. Laurent. She spent between four and five days a week at the plant, averaging approximately eight hours a day. Her duties included the hiring, discharging and supervising of employees, and the packaging and shipping of the product. During this time Georges St. Laurent was principally employed with respect to his work as consultant to hotels and to the American Hotel Association. However, he worked in the plant in the evenings and managed the financing of the business. Prior to December 1943, Marian St. Laurent had never received any salary or other compensation for the services which she had rendered to the corporation. Georges St. Laurent had received only $1,000 for services which he had rendered. On December 14, 1943, the Board of Directors held a special meeting, at which they voted to dissolve the corporation and to pay salaries *106 to Georges and Marian St. Laurent for the year 1943 in the amounts of $3,000 and $10,000, respectively. At the same time, the St. Laurents decided to carry on the business as a partnership. Their respective capital contributions to the partnership were to be the salaries voted to them by the corporation less the Federal taxes payable on such salaries. They were required to assume individual liability on large amounts the corporation had borrowed from the Reconstruction Finance Corporation. Since its creation, the corporation maintained a checking account with the Chase National Bank of New York City. During all of 1943, the St. Laurents were authorized to withdraw funds from this account by checks signed by either one. Marian St. Laurent usually signed the payroll and supply checks while Georges St. Laurent usually signed checks for other bills. On December 14, 1943, the corporation had only $2,209.08 in its account with the Chase National Bank, but the directors were expecting, within a few days, a substantial check from the Reconstruction Finance Corporation in connection with a Government contract that had been completed. It was decided at the directors' meeting that the St. *107 Laurents could withdraw the salaries which had been voted them as soon as the check from the Reconstruction Finance Corporation was received. The Board of Directors intended the salaries to be payable in 1943. Some time prior to December 27, 1943, the corporation received a check from the Reconstruction Finance Corporation in the amount of $11,802.20. The check was deposited on December 27, 1943, in the corporation's account with the Chase National Bank, and the check was cleared and the proceeds received by the bank on December 28, 1943. From December 28 through December 31, 1943, the corporation's account with the Chase National Bank was never less than $16,174.28. The corporation's balance sheet on December 31, 1943 reflected $2,494.80 and $8,282.00 as "Officers' Salaries Payable" to the St. Laurents, such amounts being the amounts voted by the Board of Directors less the Federal withholding and social security taxes on their salaries. These amounts were also credited to the St. Laurents on the books of the corporation. Such amounts could have been withdrawn without restriction by the St. Laurents at any time from December 28, 1943 through December 31, 1943. The St. Laurents *108 did not withdraw their salaries until March 1, 1944. They did not need their salaries prior to that time. From and after December 28, 1943, they knew that the funds to pay them were available and that either one could withdraw his salary by writing a check on the Chase National Bank account. In April 1944, the corporation paid to the collector of internal revenue the taxes it withheld on the salaries paid to the St. Laurents. On or about March 15, 1944, Georges St. Laurent filed his Income and Victory Tax return for 1943. He did not report the above salary of $3,000 because he believed the tax on this salary had been withheld and that, therefore, it was unnecessary to report it. The withholding tax, which first became effective in 1943, was confusing to him at the time he filled out his original return. Marian St. Laurent had not been required to file a Federal income tax return for any year prior to 1943 and did not file one for 1943 within the time required by law because she relied upon her husband's advice that it was unnecessary since the tax on such salary had already been withheld. In the latter part of 1944, Georges St. Laurent's accountant advised the St. Laurents that *109 the full tax on these salaries had not been paid. In January 1945, Georges St. Laurent filed an amended return for 1943 in which he reported the salary of $3,000. In the same month, Marian St. Laurent filed an Income and Victory Tax return for 1943 in which she reported her salary of $10,000. Neither of the St. Laurents claimed a credit on their 1943 returns for the tax withheld by the corporation but credits for such amounts were claimed on their 1944 returns. In its Corporate Income and Declared Value Excess Profits Tax return for 1943, the corporation deducted salaries of $3,000 and $10,000 authorized as payable to the St. Laurents and in a schedule attached to this return showed the amount of such salaries (less the withholding and social security taxes) as being due them. On or about December 14, 1943, Georges St. Laurent, as president of the corporation filed with the Department of Taxation and Finance of the State of New York an application for consent to the dissolution of the corporation. In the application he listed the amount of the corporation's assets remaining to be liquidated at approximately $2,000. This figure was estimated to be the amount that would be left in *110 the corporation's bank account at the end of 1943 after the payment of all the corporation's liabilities including the salaries voted to the St. Laurents on December 14, 1943. On December 20, 1943, a certificate of dissolution of Hotel Research Laboratories, Inc. was filed with the New York Department of State. A Corporate Income and Declared Value Excess Profits Tax return for 1944 was filed in behalf of the corporation, and on the face of that return was the notation: "Final Return, Company Liquidated." The salaries of $3,000 and $10,000 voted by the corporation's Board of Directors at the meeting of December 14, 1943, were constructively received by Georges and Marian St. Laurent, respectively, in the year 1943 and represent taxable income for that year. Issue 2 On January 1, 1944, the St. Laurents entered into a written partnership agreement to operate under the name of Hotel Research Laboratories and to carry on the business formerly conducted by Hotel Research Laboratories, Inc. The agreement provided that the capital contributions of the St. Laurents were to be $2,494.80 and $8,282.00, respectively, and that the profits and losses of the business were to be divided *111 equally. On December 27, 1943, the St. Laurents filed with the County Clerk's office a certificate for transacting business in the County of New York under the name of Hotel Research Laboratories. On March 1, 1944, the St. Laurent partnership leased a plant at Closter, New Jersey, which it eventually purchased. At about the same time, it received a substantial contract for the sale of solidified alcohol to the United States Government and within six weeks it received additional contracts totaling $555,000. The St. Laurent partnership was one of the two suppliers of solidified alcohol in the United States. In March of 1944 it had only three or four employees. Within three months it had over 500 employees. From March 1944 until August 8, 1945, the plant was operated sixteen to twenty-four hours a day, six or seven days a week. During most of this period the St. Laurents worked 16 to 18 hours a day and ate no meals at home. The gross sales of the St. Laurent partnership for the fiscal year January 1, 1944 through November 30, 1944, were approximately $1,500,000. A fiscal year ending on November 30th was chosen at the suggestion of the partnership's accountant so that the preparation *112 of the partnership's returns would not fall at a time when he was overloaded with work of other clients. The business of the St. Laurent partnership was hazardous. Many employees were overcome by chemical fumes. Marian St. Laurent hired employees, set up production lines, planned production methods, purchased machinery, and examined the finished product. Georges St. Laurent procured Government contracts, dealt with suppliers, attended to the financing of the business, and supervised the bookkeeping and the office. Haas was the only other person in an executive capacity. He was employed in April 1944, as a part-time consultant and in July 1944, on a full-time basis as plant manager. Apart from those on the production line and in the shipping department, the only other employees were a secretary and a bookkeeper in the New York office, and a payroll clerk and a girl in charge of the Closter office. In the latter part of 1944, the St. Laurents jointly purchased from Howard Dayton, hereinafter called "Dayton," 50 per cent of the stock of corporations owning hotels in Brunswick, Georgia; Ashland, Kentucky; and Anderson, Indiana. Dayton, an old friend of Georges St. Laurent who operated *113 a chain of 25 hotels from headquarters in Albany, Georgia, owned the remaining 50 percent of the stock. Dayton knew that Georges St. Laurent was busy with the St. Laurent partnership but thought that he would be able to assist Dayton after the war was over. Between November 27, 1944 and May 24, 1945, the St. Laurents expended $119,088.50 on the hotels in the form of loans and investments. This amount originated in the distributive shares of the St. Laurents in the partnership income. In April 1945, Dayton asked Georges St. Laurents to meet him in Ashland, Kentucky, to review the books and records of their hotel there. St. Laurent did so and they found that the hotel owed about $18,000. Dayton and St. Laurent each wrote a check for approximately $9,000 to cover these debts. They also discovered that the hotel had had three managers in the previous three months and that the present manager had received his draft notice. From Ashland, Kentucky, they proceeded to Anderson, Indiana where they found a similar situation. The manager there was anxious to be relieved of his position, the payroll was out of line, the heating system was in bad condition, and the hotel owed $15,000. Dayton *114 and St. Laurent remained two days and before leaving, they each wrote a check for $7,500 to pay the hotel's outstanding bills. Georges St. Laurent had worked summers in hotels when he was in high school and had received his degree from Cornell in the field of hotel administration. Prior to 1944, his consulting work had been devoted to engineering and rehabilitation problems of hotels. As a result of his trip to Ashland and Anderson, he concluded that it would be necessary for him to devote a great deal of time to the hotel properties if the St. Laurents were to avoid losing their investment. While Georges St. Laurent was away, the plant at Closter operated 24 hours a day. Marian St. Laurent was there continuously. When she slept, she slept in her car outside the plant. She was capable of handling all phases of the business but was not physically able to operate it 24 hours a day. Upon Georges St. Laurent's return, they decided that it would be necessary to take a new partner into the business who could share with Marian St. Laurent the responsibilities while Georges St. Laurent supervised the hotel properties. Haas was the only person they knew who had the practical experience *115 and technical background necessary to assume the responsibilities of a partner. In the middle of May 1945, the St. Laurents offered Haas a partnership interest, consisting of 15 per cent of the profits up to $125,000 with the obligation to assume losses in the same proportion. At that time, Haas was earning $10,000 annually as plant manager. The St. Laurents believed that under their offer he would earn $18,000 annually. Georges St. Laurent explained to Haas that he had to devote more time to the hotel business and told Haas that as a partner, Haas would be required to assume the responsibilities that Georges St. Laurent had previously assumed, i.e., to execute contracts, order materials, make important decisions, and probably work a great deal longer. Haas told the St. Laurents that he was not interested in coming into the St. Laurent partnership because he did not want to be responsible for any of its liabilities. Haas knew that in the early days of the partnership, required safety devices had not been installed with the result that many employees had been overcome by chemical fumes and one man in particular had been seriously injured. Haas feared that the St. Laurent partnership *116 might be liable. In addition, it was his policy never to go into an old partnership under any condition. Several days later, the St. Laurents met with Haas again and offered to form a new partnership with him. He agreed to this because it was an opportunity to better his financial possibilities. On June 1, 1945, Haas and the St. Laurents entered into a written partnership agreement which provided in part as follows: * * *
"WHEREAS, it is the intent and desire of all the parties hereto to form a new partnership for the continuation and conduct of the said business, which new partnership shall in all respects succeed the heretofore existing partnership consisting of the * * * [St. Laurents] doing business under the firm name and style of HOTEL RESEARCH LABORATORIES, "NOW, THEREFORE, * * * the parties hereby agree as follows: * * *
"2. That the partnership business shall be conducted under the firm name and style of HOTEL RESEARCH LABORATORIES. "3. This partnership shall take effect as of June 1st, 1945, the date of the signing of this agreement, and shall continue for a period of one year, unless otherwise agreed by mutual consent. * * *
"5. [Haas and Marian *117 St. Laurent] shall devote all their time and attention to the business including the management of the plant and office at 48 Perry Street, Closter, New Jersey. * * * [Georges St. Laurent] shall devote as much of his time as he shall deem necessary and expedient for the best interests of the business. "6. Each of the parties hereto shall have the authority to bind the firm in all business transactions, and sign the names thereof to all contracts within the scope of the aforesaid business, and in the name of the partnership to purchase all necessary real estate whereupon to erect suitable buildings and appurtenances for the manufacture and sale of the products hereinabove mentioned. * * *
"8. The * * * [St Laurents] shall contribute as capital the assets of the business formerly conducted by them under the firm name of HOTEL RESEARCH LABORATORIES subject to all existing liabilities as of the close of business on May 31st, 1945 * * *
"13. All funds of the partnership * * * shall be subject to withdrawal by check or draft bearing the signature of any partner, or such other person as * * * [Georges St. Laurent] may from time to time designate, in order to facilitate *118 the operation of said business. Each partner may negotiate for bank loans and sign notes or other evidence of indebtedness in connection with the business of the partnership. "14. Full, complete and accurate books of account shall be kept and maintained by the partnership, * * * and these books of account shall be kept at the place of business of the partnership or at its executive office, and each of the parties hereto shall at all reasonable times have access thereto and may inspect and make copies thereof. * * *
"16. The net profits of the business shall be divided in accordance with the following schedule: "Up to an not exceeding the first One Hundred and Twenty Five Thousand ($125,000.00) Dollars, the * * * [St. Laurents] shall receive 42 1/2% each and the balance of 15% shall go to * * * [Haas]. "Any amount exceeding the said One Hundred and Twenty-Five Thousand ($125,000.00) Dollars shall be divided equally between the * * * [St. Laurents]. "Losses, if any, shall be divided on the same basis as heretofore provided for the division of the profits. * * *
"18. The fiscal year of the partnership shall end on such date as is agreed upon by the partners. *119 " * * *
In June 1945 the Haas & St. Laurent partnership filed with the County Clerk of New York County a certificate stating that the Haas & St. Laurent partnership was the successor to the business theretofore conducted by the St. Laurent partnership. At the time the St. Laurents offered to form a new partnership with Haas, the St. Laurent partnership had unfilled Government contracts extending into April 1946, in an amount in excess of $2,000,000. At about that time, Georges St. Laurent tried to increase the partnership's productive capacity. On May 16, 1945, the St. Laurent partnership gave the Davies Can Company of Cleveland, Ohio a contract for 5,200,000 cans involving over $100,000. On June 1, 1945, their business was still expanding. Neither the St. Laurents nor Haas anticipated an early ending of the war nor an early ending of the partnership. Regardless of how long the war with Japan lasted, they felt there would be substantial business for the partnership due to requirements of the occupation forces. At no time did either of the St. Laurents discuss the question of whether they would save income taxes by dissolving the St. Laurent partnership and forming a new partnership. *120 The books of the St. Laurent partnership were closed as of May 31, 1945, and a completely new set of books were opened for the Haas & St. Laurent partnership on June 1, 1945. On or about August 18, 1945, the St. Laurent partnership filed with the collector of internal revenue for the third district of New York a return for the fiscal year beginning December 1, 1944, and ending May 31, 1945, marked "Final Return, Partnership Dissolved May 31, 1945." In June 1945, the Haas & St. Laurent partnership informed, in writing, the five banks with whom the St. Laurent partnership had a total of over $250,000 in cash on deposit that the St. Laurent partnership was discontinued as of May 31, 1945 and that the Haas & St. Laurent partnership had been formed as of June 1, 1945, to operate under the same name. Copies of the Haas & St. Laurent partnership agreement and new signature cards were also sent to the banks. Thereafter, the banks closed the accounts of the St. Laurent partnership and transferred the funds to new accounts which were opened in the name of the Haas & St. Laurent partnership. The Haas & St. Laurent partnership also notified Bankers Commercial Corporation from whom the St. *121 Laurent partnership had received a great deal of its financing, and a new accounts-receivable agreement was executed by Haas and the St. Lourents and filed with that corporation. On May 29, 1945. the St. Laurent partnership informed the collector of internal revenue, the New York State Unemployment Fund, the Department of Finance of New York City, and the Unemployment Compensation Commission of New Jersey that it was to be dissolved as of May 31, 1945, and as of June 1, 1945, the Haas & St. Laurent partnership would operate under the same name. New registration numbers were received from the taxing authorities. Returns and reports were subsequently filed with them setting forth detailed information about the dissolution of the old and the formation of the new partnership. Various insurance companies were also notified of the change and endorsements were received showing that the name of the insured after June 1, 1945, was the Haas & St. Laurent partnership. Georges St. Laurent also notified the Procurement Officer of the Jersey City Quartermaster Depot and various suppliers that the St. Laurent partnership had been dissolved, that the Haas & St. Laurent partnership had been formed, *122 and that Haas was going to assume much of the work formerly done by Georges St. Laurent. The Haas & St. Laurent partnership kept its books on the basis of a fiscal year ending May 31, 1946. The St. Laurent partnership did not continue business operations after May 31, 1945. Its assets were transferred to the Haas & St. Laurent partnership subject to the liabilities of thest. Laurent partnership. Haas, an engineer by profession, is not related to either of the St. Laurents. As an employee of the St. Laurent partnership, he was in charge of the shipping room and handled routine matters on instructions from the St. Laurents. As such he did not participate in any basic policy decision, was never at the plant without one of the St. Laurents being there, did not hire or discharge employees, and was not authorized to sign checks or examine the books and records of the partnership. Under the Haas & St. Laurent partnership, Haas signed checks on the partnership's bank accounts, ordered materials from suppliers, hired employees without consulting the St. Laurents, signed contracts on behalf of the partnership, had access to the partnership's books and records, was given the basic formula *123 for making solidified alcohol, and participated in policy meetings with the St. Laurents. Policy meetings were always held by the St. Laurents and Haas immediately prior and subsequent to trips Georges St. Laurent made in connection with his hotel business. Haas and Marian St. Laurent held policy meetings by themselves during Georges St. Laurent's absence. Under the Haas & St. Laurent partnership, Georges and Marian St. Laurent devoted about one-third and two-thirds, respectively, of the time they had previously spent to the business. Georges St. Laurent devoted the balance of his time to their hotels. Haas had expected to receive $18,000 annually as a partner in lieu of the $10,000 he received as an employee. During the first fiscal year of the Haas & St. Laurent partnership, he drew $14,000. During 1944 and 1945 the earnings of Hotel Research Laboratories attributable to civilian use amounted to only a few thousand dollars. On August 8, 1945 the Government cancelled all its contracts with the Haas & St. Laurent partnership. Shortly thereafter, Haas, without the assistance of the St. Laurents, arranged for the sale of the plant at Closter and some of the partnership's equipment. *124 He then designed a new and smaller building and started plant operations for civilian business. After August 8, 1945 the gross sales of the business were less than $10,000 a year. Because civilian business was small, because losses were anticipated and because Haas did not wish to share in such losses, the Haas & St. Laurent partnership was terminated on May 31, 1947. On April 19, 1946 a renegotiation agreement was executed between the St. Laurent partnership and the United States of America for the period from December 1, 1944 to May 31, 1945. In his income tax return for the year 1946 Haas deducted $14.55 as a contribution "Through Partnership." In the deficiency notice addressed to him respondent held that Haas was not a bona fide partner for Federal income tax purposes in the partnership known as Hotel Research Laboratories, and accordingly disallowed the deduction. In his petition herein Haas alleged that respondent erred in this regard. In his deficiency notices to the St. Laurents respondent stated: "It is held that Cecil I Haas did not, in 1945, or any subsequent year, become a bona fide partner in the partnership known as Hotel Research Laboratories and created by *125 agreement entered into between Georges C. St. Laurent and Marian St. Laurent January 1, 1944; and it is held further that that partnership was not actually dissolved and terminated on May 31, 1945, or on any other date prior to May 31, 1947;" * * * The St. Laurent partnership was completely dissolved and terminated on May 31, 1945, and its fiscal year ended as of that date. Thereafter Haas exercised the functions, duties and responsibilities of a partner in all respects. The Haas & St. Laurent partnership was a valid partnership for tax purposes commencing business on June 1, 1945, and its fiscal year began on that date and ended on May 31, 1946. Issue 3 Proceeding from his determination that the St. Laurent partnership was not dissolved on May 31, 1945, respondent reconstructed the partnership income to include the period from June 1 through November 30, 1945. In reconstructing the income of the St. Laurent partnership for the fiscal year ended November 30, 1945, respondent included all of the gross profit reported on the partnership returns for the period November 30, 1944 to May 31, 1945, and for the period June 1, 1945 to May 31, 1946. He then subtracted all of the expenses, *126 as corrected, which were reported on the return for the period November 30, 1944 to May 31, 1945, but only 50 per cent of the expenses reported on the return for the period June 1, 1945 to May 31, 1946. Respondent then determined that the resulting net income was taxable to the St. Laurents, 50 per cent being allocated to each. Respondent also reconstructed the St. Laurent partnership's income for the fiscal year ended November 30, 1946 which resulted in a net operating loss. In determining the tax liability of the St. Laurents for the calendar year 1944, respondent did not carry back to 1944 their distributive share of this net operating loss. Issue 4 The St. Laurent partnership agreement of January 1, 1944, required all expenses incurred in carrying on the business to be paid out of the partnership's receipts and earnings, and complete books of accounts were to be maintained by the partnership to reflect all payments made in its behalf. The St. Laurent partnership kept its books on an accrual basis. In its return for the fiscal year ended November 30, 1944, the St. Laurent partnership deducted $1,128.91 for taveling and entertainment expenses. This deduction was based solely *127 upon the vouchers contained in the partnership's files. Georges St. Laurent submitted vouchers totalling only $197.50. No vouchers were submitted by Marian St. Laurent. Apart from the $197.50, the partnership did not reimburse either of the St. Laurents for any other amounts they expended on behalf of the partnership for traveling and entertainment during 1944. For the period December 1, 1944 to May 31, 1945, the St. Laurent partnership claimed and was allowed a deduction of $8,769.46 for traveling and entertainment expenses. In their individual tax returns for 1944, the St. Laurents deducted $5,000 and $1,000, respectively, for traveling and entertainment expenses. During 1944, the St. Laurents spent their lunch and dinner hours discussing company business with either a Government representative, a supplier, or an employee. There was no recreation room at the Closter plant and Georges St. Laurent felt that it was necessary for him to entertain the employees in order to retain their services, especially in view of the dangerous type of work they were doing. A schedule of the St. Laurents' estimated expenses is as follows: Georges St. Laurent
1. Travel
a. 25 trips to Washington, D.C.
at an average cost of $30 per
trip
$ 750
b. 5 trips to Boston at an aver-
age cost of $35 per trip
175
c. 2 trips to Philadelphia at an
average cost of $12.50 per trip
25
d. 100 trips to New York City
at an average cost of $10 per
trip
1,000
$1,950
2. Business lunches and dinners
with Government representa-
tives, suppliers and employees
a. 200 lunches at an average
cost of $3 per lunch
600
b. 150 dinners at an average
cost of $5 per dinner
750
$1,350
3. Employee entertainment
a. 3 parties for employees at $300 each
$ 900
b. About $60 per week picking
up checks at weekly em-
ployee gatherings
3,000
$3,900
4. $1 per day for miscellaneous
items such as taxicabs, tele-
phone calls, and the purchase
of minor supplies
$ 365
Total
$7,565
Marian St. Laurent
1. Travel
a. 50 trips to New York City at
an avreage cost of $5 per trip
$ 250
2. Lunches with Government rep-
resentatives, suppliers and em-
ployees
a. 300 lunches at $3 per lunch
$ 900
3. $1 per day for miscellaneous
items such as taxicabs, tele-
phone calls, and the purchase of
minor supplies
$ 365
Total
$1,515
*128 A part of the foregoing sums were spent by the St. Laurents on behalf of the partnership and neither of the St. Laurents was reimbursed for any of such expenditures. Neither kept any vouchers or records for these estimated expenditures. The amounts of $1,500 and $400 were expended as ordinary and necessary business expense in 1944 by Georges St. Laurent and Marian St. Laurent, respectively. Opinion I. Respondent's sole ground for rejecting petitioners' claim of constructive receipt of salaries in a prior year, see Ross v. Commissioner, (C.A. 1) 169 Fed. (2d) 483, is based on a provision of the New York State corporation law which requires a dissolving corporation to announce its intention of winding up its affairs by publication of that fact. Respondent insists that this applies to petitioners' employer, carries with it the collateral and accompanying prohibition against any payments by a corporation during the period of publication, and hence made it unlawful for them to draw the salaries during the prior year. He cities no cases supporting that interpretation and we *129 have found none. But even if the language of the New York statute has the effect for which he contends the dates are such that his ultimate conclusion would have to be rejected. Since all that is called for by the requirement of publication is an advertisement once each week for two successive weeks, "publication * * * could well come to an 'expiration' within 8 succeeding days." R. J. Horner & Co. v. Lawrence, 86 Misc. (N.Y.) 95; 149 N.Y. Supp. 82, 85. Publication might have commenced on the day of the filing of the certificate of dissolution in which event the period could have ended December 28 thus eliminating even under respondent's view of the statute any legal impediment to the payment. It is true that the record is silent on this point and normally the burden would have been upon the petitioner to produce the necessary facts. But neither the deficiency notice, the pleadings, nor even the opening statement gave any indication that respondent proposed to rely upon the statutory requirement which we are discussing. The point was raised for the first time *130 upon brief. Under such circumstances to require petitioner to maintain a burden of proof as to which no prior notice or suggestion had been advanced would offend too flagrantly the principle that a taxpayer must be given adequate advance information to enable him to recognize and prepare for factual issues, to warrant imposing the burden upon petitioner in this case. Sangston Hettler, 16 T.C. 528, 535; Warner G. Baird, 42 B.T.A. 970; see Wentworth Manufacturing Co., 6 T.C. 1206. We are unable to sustain the deficiency in this respect. II. The existence of a partnership among the two St. Laurents and Haas is attacked by respondent on the ground that no real partnership existed. As we view the record it abundantly refutes that position. The change in Haas' status from that of a mere salaried employee to one of full-fledged partner was no mere matter of form. He acquired all of the traditional prerogatives of partnership including participation in management, the right to sign checks and inspect partnership records, and both the privilege and obligation of sharing in the partnership orofits and losses. We accordingly conclude and have so found *131 that Haas became a bona fide partner with the two pre-existing partners on June 1, 1945. Even so it is urged that the old partnership continued and that its taxable year remained the same and was not terminated until the full 12 months had expired. Although the mere addition of a new partner without anything further may not serve to terminate a previously existing partnership and cause it to account for its income on a short fiscal year, see Callahan v. War Contracts Price Adjst. Bd., 13 T.C. 355, 360 [4 CCF [*] 60,728]; and although changes in the manner in which the partnership is constituted do not suffice for the same purpose unless they are "substantial," Vera Melin Britz, 14 T.C. 1094, 1102; the issue nevertheless "presents only a question of fact." Rose Mary Hash, 4 T.C. 878, 896, affirmed other issue (C.A. 4) 152 Fed. (2d) 722, certiorari denied 328 U.S. 838. By our ultimate finding we have determined the matter in petitioners' favor as a factual question. While there are a number of circumstances tending in *132 both directions, our conclusion from the record as a whole is that the parties intended to and did terminate the old partnership and create a new one. We should be unable to make any other finding without disregarding the direct testimony of Haas, a virtually disinterested witness from all that appears. This we are unwilling to do. On this issue the deficiency is disapproved. III. In the light of this disposition, the third issue need not be considered. Likewise certain questions as to the tax liability of the St. Laurents [2] for the year 1946 are not dealt with for the reason among others that no deficiency as to them was determined for that year and jurisdiction to consider them is accordingly absent. Section 272, I.R.C.; Will County Title Co., 38 B.T.A. 1396. IV. As to the entertainment expense we have made findings of fact as to the amounts which under the rule of Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540, and under all circumstances shown by the record we think should be allowed as deductions. *133 In arriving at this figure consideration has been given to the circumstances: (1) that the sum of $1,128.91 supported by vouchers has already been allowed as a deductible expense of the partnership; [3] (2) that on petitioners' own statement some part of the claimed expenditures was for entertainment of Government employees and hence non-deductible as being contrary to sound public policy, Raymond F. Flanagan, 47 B.T.A. 782; (3) that the estimates for most items appear to us unduly high; and (4) that our determination may bear heavily against the taxpayer in the light of his failure to produce more convincing substantiation. These items are being allowed to the individual petitioners notwithstanding that the expenditures were obviously made on behalf of the partnership, see Hiram C. Wilson, 17 B.T.A. 976, appeal dismissed (C.A. 10) 55 Fed. (2d) 1086; Western Construction Co., 14 T.C. 453, affirmed (C.A. 9) 191 Fed. (2d) 401, since respondent has advanced no contention based upon these authorities and this ground for disallowance is not pressed.
*134 Decision will be entered under Rule 50. Footnotes
1. An effort also appears to raise issues respecting 1946 as to which year respondent determined only overassessments.↩
2. See footnote 1, supra.↩
3. This was for only eleven months, and a new and larger amount was claimed by the partnership for its next fiscal year.↩